## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Task Force Officer Douglas Ruth, Drug Enforcement Administration, being duly sworn, depose and state as follows:

## I. INTRODUCTION

### Agent Background

1.      I am a Police Officer for the town of Hampton, New Hampshire, and have been so employed since June 2009.   Since August 2012, I have held the rank of Detective.   Since August 2015, I have been assigned as a Task Force Officer ("TFO") with the United States Drug Enforcement Administration ("DEA") in Portsmouth, New Hampshire.   I am a "federal law enforcement officer" as defined in Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure, that is, a government agent who is engaged in enforcing the criminal laws of the United States and within a category of officers authorized by the Attorney General to request a search warrant.

2.      I have received training regarding narcotics investigations while attending the 150th New Hampshire Police Standards and Training Police Academy and have attended additional specialized training courses in furtherance of my past and current assignments.

3.      I have participated in all aspects of drug investigations, including physical surveillance, surveillance of undercover transactions, the introduction of undercover agents, the execution of search warrants, the effecting of arrests, and debriefings of defendants, informants, and witnesses who had personal knowledge regarding major narcotics trafficking organizations. I have also reviewed recorded conversations and telephone, financial, and drug records.   Through my training and experience, I have become familiar with the manner in which illegal drugs are imported, transported, stored, and distributed, and the methods of payment for such drugs.   I have

1

also become familiar with the manner in which narcotics organizations utilize various forms of violence and intimidation in furtherance of their narcotics trafficking activity, to protect their operations, members, narcotics, and narcotics proceeds.

4.      Based on my training and experience, I am familiar with the methods of operation employed by drug traffickers operating at the local, statewide, national, and international levels, including those involving the distribution, storage, and transportation of controlled substances and the collection of money that constitutes the proceeds of drug-trafficking activities.   Specifically, I am familiar with the manner in which drug traffickers use vehicles, common carriers, mail and private delivery services, and a variety of other means to transport and distribute narcotics and the proceeds of narcotics trafficking.   I am familiar with the manner in which drug traffickers often store drugs and drug proceeds in storage sites commonly referred to as "stash houses."

5.      Based on my training and experience, I am aware that drug traffickers commonly use cellular telephones to communicate and further their drug-trafficking activities.   However, drug traffickers are aware of law enforcement's use of electronic surveillance, and thus frequently endeavor to thwart detection by changing cellular telephone numbers, using multiple cellular phones at the same time, and/or utilizing prepaid cellular phones where the user of the phone is not required to provide personal identifying information.   I am also aware that drug traffickers frequently "drop" or change cellular telephone numbers and cellular telephones in an effort to thwart law enforcement's use of electronic surveillance.   I am familiar with the manner in which narcotics traffickers use telephone, coded, veiled, or slang-filled telephone conversations when discussing their illegal business, in an effort to further prevent detection, and that they often use text messages in lieu of phone calls to avoid speaking over the telephone.   I am familiar with the

"street" language used by drug traffickers, as well as the methods they use to disguise conversation and operations.

### Purpose of the Affidavit

6.     I submit this affidavit in support of an application for a criminal complaint alleging that since at least May 2021 and continuing to the present, Randell Starlin MEDINA-RODRIGUEZ ("MEDINA"); Williams COLON SANCHEZ ("COLON SANCHEZ"); Cortney MOULTON ("MOULTON"); Robert RODRIGUEZ Jr. ("RODRIGUEZ"), and Douglas MORRIS ("MORRIS") (the "Target Subjects" or collectively, the drug trafficking organization ("DTO")), conspired to distribute and possess with intent to distribute 400 grams or more of fentanyl, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A)(vi) (the "Target Offense").

7.     Based on the facts set forth in this affidavit, there is probable cause to believe that the Target Subjects have committed the Target Offense.

8.     As a result of my personal participation in the investigation, review of reports submitted by other law enforcement personnel, and my consultations with other law enforcement officers, I am familiar with this investigation.   The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses, among other things.   I submit this affidavit for the limited purpose of establishing probable cause for the requested criminal complaint.   Accordingly, I have not included each and every fact known to me and other law enforcement officers involved in this investigation.

## II. PROBABLE CAUSE

### *Background of Investigation*

9.     Since early 2021, investigators have been investigating the Target Subjects for distribution of controlled substances, including purported oxycodone pills and fentanyl powder, in and around the Andover and Lawrence areas of Massachusetts.   Investigators have conducted multiple controlled purchases from MEDINA.   For each of these transactions, an undercover officer ("UC") or confidential source ("CS")[1] communicated with an individual identified by investigators, but referred to herein as "COCONSPIRATOR 1,"[2] via recorded calls and/or text messages.   As detailed below, investigators believe COCONSPIRATOR 1 and MEDINA worked together to distribute the fentanyl for these controlled purchases.    Investigators have also observed suspected drug transactions conducted by one or more of the Target Subjects and have stopped the customers, from whom investigators seized fentanyl delivered by the Target Subjects.

10.     Throughout the investigation, the Honorable Marianne B. Bowler, United States Magistrate Judge, has authorized a number of search warrants in furtherance of the investigation, including, *inter alia*, tracking warrants for two vehicles used by members of the DTO: a 2005 blue Honda CRV, bearing Massachusetts Registration 1VCY59 (the "CRV"), and a 2008 black Lincoln Navigator bearing Massachusetts registration 1VCY69 (the "Navigator") (21-2532-2533-MBB and 21-2606-2607-MBB).   As detailed below, in late 2021, the DTO transferred these license

---

[1] CS has a criminal history that includes a conviction for possession of a controlled substance.   CS has state charges pending for trafficking in fentanyl and is cooperating in hopes of receiving leniency in charging and/or sentencing decisions in this pending case.    The information provided by CS has been corroborated to the extent possible, and CS is believed to be reliable.

[2] Investigators have identified COCONSPIRATOR 1 but are withholding his name from this affidavit because he is believed to be out of the country at this time, and unavailable for arrest.   As such, this complaint does not seek to charge COCONSPIRATOR 1, and identifying him publicly at this juncture could cause him to further flee to avoid prosecution.

plates from the CRV and Navigator to different vehicles:    Massachusetts registration 1VCY59 was switched onto a 2014 Ford Edge (the "Edge"), and 1VCY69 was switched onto a 2007 gray Ford Explorer (the "Explorer").   On January 27, 2022, the Honorable Marianne B. Bowler authorized tracking warrants for these new vehicles (22-2085-2088-MBB).   The affidavits in support of those warrants are incorporated herein by reference.

### June 8, 2021: MEDINA Delivered ~100 Grams of Suspected Fentanyl to CS After COCONSPIRATOR 1 Coordinated the Transaction

11.    On June 8, 2021, at the direction of investigators, CS sent text messages and placed phone calls to telephone number 551-284-4087 ("the 4087 Number"), used by a male who was later identified as COCONSPIRATOR 1 to purchase 100 grams of fentanyl powder in exchange for $2,000.   COCONSPIRATOR 1 and CS agreed to conduct the transaction at a Stop & Shop grocery store located at 100 Macy Street in Amesbury, Massachusetts.

12.    Court-authorized GPS data for the CRV indicated that it departed from the area of MEDINA's residence at 106 Hawthorne Way, Lawrence, Massachusetts, at approximately 6:57 p.m. and drove to a shopping plaza located at 45 Storey Way, Newburyport, arriving at approximately 7:23 p.m.   At approximately 7:40 p.m., the CRV drove to the area of a Walmart in Methuen, then to a rest stop, and finally drove toward the meeting location in Amesbury.

13.    In advance of the meeting with MEDINA, investigators searched CS and CS's vehicle with negative results and equipped CS with audio/video recording equipment and $2,000 in official funds.   CS traveled to the Amesbury Stop & Shop meeting location, arriving at approximately 8:17 p.m.   COCONSPIRATOR 1 then sent CS a text message, directing CS to meet in the bathroom inside the Stop & Shop grocery store.   At approximately 8:45 p.m., CS walked into the Stop & Shop.   At around this same time, investigators observed the CRV arrive

in the Stop & Shop parking lot.   MEDINA exited the CRV and walked into the grocery store.   At approximately 8:51 p.m., investigators observed MEDINA walk back out of the Stop & Shop, enter the CRV, and drive away.   GPS data indicated that MEDINA drove the CRV back to the area of his residence at 106 Hawthorne Way in Lawrence.

14.     Meanwhile, CS exited the Stop & Shop shortly after MEDINA, and traveled directly to meet with investigators, where CS handed off a clear plastic bag containing 10 cylinders of pressed tan powder wrapped in wax paper, each weighing approximately 10 grams, for a total of approximately 100 grams.   CS told investigators that MEDINA met CS in the restroom of the Stop & Shop and handed CS the bag of pressed cylinders in exchange for $2,000.   CS stated that MEDINA entered one of the bathroom stalls to count the $2,000 before he left the bathroom.   The pressed powder cylinders were field tested and tested positive for fentanyl.   The cylinders have been sent to the DEA laboratory for analysis, and the results are pending, however, based on the field test results and the color and consistency of the powder, I believe the powder contains fentanyl.

15.     Based on the above, I believe COCONSPIRATOR 1 coordinated the delivery of approximately 100 grams of fentanyl, which were ultimately delivered by MEDINA, who drove the CRV to and from the transaction.

### June 28, 2021:   COCONSPIRATOR 1 Delivered ~1.6 Kilograms of Suspected Fentanyl and ~300 Grams of Suspected Cocaine to MORRIS

16.     On June 28, 2021, investigators monitored the court-authorized GPS tracking device on the CRV and observed that it traveled to several locations, including to a suspected residence of COCONSPIRATOR 1.   At approximately 9:42 p.m., the CRV drove to a Fairfield Inn hotel in Amesbury, Massachusetts, where it pulled into the rear parking lot.   Investigators

were unable to view the driver of the CRV but believe, based on the travel to COCONSPIRATOR 1's residence, that the driver was likely COCONSPIRATOR 1.

17.     At approximately 10:07 p.m., while the CRV remained parked in the rear lot of the Fairfield Inn, investigators observed a Nissan sedan parked in the front parking lot at the hotel, occupied by two men.   Investigators observed a white male (later determined to be MORRIS) walk from the passenger side of the Nissan to the rear parking lot, where the CRV was parked. At approximately 10:15 p.m., investigators observed MORRIS walk back to the Nissan and enter the passenger seat.   Approximately one minute later, the CRV drove away from the rear hotel parking lot and briefly stopped at a location in Methuen before it traveled to COCONSPIRATOR 1's residence.

18.     Although investigators did not see where MORRIS traveled when he walked behind the hotel, investigators believe he met with COCONSPIRATOR 1 in the CRV because it was the only vehicle parked in that area of the rear lot and because the CRV departed the area almost immediately after MORRIS returned to the Nissan.   Based on my training and experience, I believe this brief meeting in a secluded location is consistent with a narcotics transaction between MORRIS and COCONSPIRATOR 1 in the CRV.

19.     Shortly after MORRIS returned to the Nissan, the Nissan departed the front hotel parking lot and traveled on Interstate 95 North from Massachusetts and into New Hampshire.   At approximately 10:33 p.m., New Hampshire State troopers executed a traffic stop of the Nissan. A male was driving, and the passenger was identified as MORRIS.[3]

20.     At the time of the roadside stop, MORRIS provided the trooper with items

---

[3] MORRIS initially provided a false name.

consistent with personal use of narcotics, including a glass pipe, liquid methadone, marijuana, and methamphetamine.   MORRIS also provided the trooper with a black backpack and provided verbal consent for the trooper to search the bag.   MORRIS told the trooper that he had approximately 100 "fingers" (or 1,000 grams) of fentanyl and between 300-400 grams of cocaine in the bag.   Inside the bag, the trooper located approximately 161 cylinders of pressed tan powder wrapped in wax paper, all further wrapped in green and clear plastic, weighing approximately 1.6 kilograms, believed to be fentanyl, and compressed white powder wrapped in green plastic, weighing approximately 300 grams, believed to be cocaine.   MORRIS told the trooper that he had paid $35,000 for the narcotics. A pat-frisk of MORRIS further revealed an additional $2,500 on his person.

21.     The pressed tan powder cylinders and pressed white powder were each field tested, and indicated positive results for fentanyl and cocaine, respectively.   The substances have been sent to the DEA laboratory for analysis, and the results are pending, however, based on the field test results, MORRIS's statements, and the color and consistency of the powders, I believe the tan powder cylinders contain fentanyl and the white pressed powder contains cocaine.

22.     After location of the suspected narcotics, MORRIS was read his *Miranda* rights. MORRIS waived these rights and spoke to the trooper about the narcotics that had been located. MORRIS explained that he had traveled to make similar narcotics purchases on approximately three prior occasions, and that he had picked up approximately 500 grams of fentanyl on each of these prior occasions.   The trooper seized the narcotics and currency (though the currency was ultimately returned to MORRIS) and released MORRIS and the driver at this time.

23.     Based on the above, investigators believe COCONSPIRATOR 1 delivered the

suspected 1.6 kilograms of fentanyl and 300 grams of cocaine to MORRIS.   Based on the large quantity of drugs seized from MORRIS, which was inconsistent with user-level quantities, investigators believe MORRIS was planning to further distribute the fentanyl and cocaine.

### July 7, 2021: MEDINA Delivered ~100 Grams of Suspected Fentanyl to CS After COCONSPIRATOR 1 Coordinated the Transaction, and COCONSPIRATOR 1 Personally Delivered ~1.7 Kilograms of Pink Suspected Fentanyl to MORRIS

24.     On July 7, 2021, at the direction of investigators, CS called and exchanged text messages with COCONSPIRATOR 1 on the 4087 Number to purchase 100 grams of fentanyl powder in exchange for $2,000, and 100 purported oxycodone pills for $1,000.

25.     At approximately 6:13 p.m., investigators reviewed pole camera surveillance and observed the Navigator arrive outside of 30 Danbury Drive in Methuen ("30 Danbury Drive"), a suspected stash house utilized by the DTO back.   At approximately 6:21 p.m., investigators observed COCONSPIRATOR 1 exit the driver's seat of the Navigator and walk into 30 Danbury Drive.

26.     At approximately 6:35 p.m., the GPS tracking data for the CRV indicated that the vehicle departed from the area of MEDINA's residence at 106 Hawthorne Way in Lawrence and traveled to a Target store in Methuen, Massachusetts.

27.     At approximately 6:37 p.m., COCONSPIRATOR 1 sent CS a text message, directing CS to a Market Basket supermarket at 25 Storey Avenue in Newburyport, Massachusetts. In advance of the meeting, investigators searched CS with negative results and equipped CS with audio/video recording equipment and $3,000 in official funds.   CS arrived at the meeting location in the Market Basket parking lot, transported in an undercover vehicle by an undercover officer, at approximately 7:02 p.m.

28.     Meanwhile, at approximately 6:54 p.m., COCONSPIRATOR 1 walked out 30 Danbury Drive, entered the Navigator, and drove away.   At approximately 7:13 p.m., the CRV arrived outside 30 Danbury Drive and pulled into a space outside building #30.   The driver, believed to be MEDINA at the time, did not exit the vehicle.   At 7:21 p.m., the CRV drove away from 30 Danbury Drive and drove to COCONSPIRATOR 1's residence.   After approximately 20 minutes, at around 7:41 p.m., the CRV drove away from COCONSPIRATOR 1's residence and back to 30 Danbury Drive, arriving at approximately 7:51 p.m.   As further detailed below, investigators believe COCONSPIRATOR 1 and MEDINA swapped vehicles at some point— possibly at this time when the CRV was at or near COCONSPIRATOR 1's residence—leaving COCONSPIRATOR 1 as the operator of the CRV and MEDINA as the operator of the Navigator for the rest of the evening.

29.     At approximately 8:05 p.m., COCONSPIRATOR 1 sent CS a text message directing him/her to move to the Shaw's supermarket parking lot located at 45 Storey Avenue. Approximately 10 minutes later, COCONSPIRATOR 1 told CS to stand outside, in front of the Shaw's market.   At approximately 8:15 p.m., MEDINA arrived and picked up CS in the Navigator, and drove to the far side of the parking lot.

30.     After the brief transaction inside the Navigator, CS walked directly to meet with investigators, where CS handed over 10 cylinders of pressed powder wrapped in green plastic wrap, and a small tied off plastic bag with approximately 100 blue circular pills stamped with "M" on one side and "30" on the opposite side.   The powder and pills were field tested and both indicated a positive result for fentanyl.   The powder and pills have been sent to the DEA laboratory for analysis, and the results are pending, however, based on the field test results and the

color and consistency of the powder, as well as my experience in other investigations with counterfeit oxycodone pills found to actually contain fentanyl, I believe both substances contain fentanyl.

31.     CS stated that when (s)he entered the Navigator, MEDINA handed CS the drugs in exchange for the $3,000.

32.     Based on the above, I believe COCONSPIRATOR 1 coordinated the delivery of approximately 100 grams of fentanyl and 100 fentanyl pills, which were ultimately delivered by MEDINA.

33.     Meanwhile, at approximately 8:08 p.m., the CRV (believed to be operated by COCONSPIRATOR 1 now) departed the area of 30 Danbury Drive and drove directly to the same Fairfield Inn in Amesbury, Massachusetts as it had on June 28, 2021 (described above).   As before, the CRV parked in the rear parking area of the hotel, at approximately 8:27 p.m. Investigators established surveillance in another parking area for the hotel, where they observed a Chevrolet Cruze with a Maine license plate.

34.     At approximately 8:30 p.m., investigators observed MORRIS walk out of the Chevrolet carrying a gray backpack, and walk around the right side of the hotel, toward the rear parking lot.   Investigators moved around the left side of the hotel to get a view of the rear parking lot.   At this time, investigators observed the CRV parked in the same area where it originally parked, and now observed MORRIS in the front right passenger seat, where he appeared to be engaged in conversation with the driver.   After approximately two minutes, investigators observed MORRIS exit the CRV.   Investigators resumed their surveillance position in front of the hotel, and observed MORRIS walk around from behind the hotel—still carrying the same gray

backpack—and reenter the Chevrolet, which then departed the parking lot.   At approximately 8:33 p.m., shortly after MORRIS exited the vehicle, the CRV drove away from the hotel.   Based on my training and experience, I believe this brief meeting inside the CRV, in the same secluded location where MORRIS retrieved fentanyl and cocaine on June 28, 2021, is consistent with a narcotics transaction between MORRIS and COCONSPIRATOR 1 inside the CRV.

35.     Investigators followed the Chevrolet onto Interstate 95 in New Hampshire, where a state trooper executed a traffic stop of the vehicle.   The trooper identified a male driver, female front seat passenger, and MORRIS as the rear seat passenger in the Chevrolet.   MORRIS exited the Chevrolet and provided verbal consent for troopers to remove a block-shaped object from his pocket.   MORRIS told the trooper that the block contained suboxone.   The block was wrapped in black electrical tape and was later determined to contain suboxone strips as well as 8 blue round "M 30" pills.   Troopers observed a backpack in the rear passenger area, next to where MORRIS had been seated, and asked who the backpack belonged to.   MORRIS stated that the backpack did not belong to him, and that he did not know who the backpack belonged to.   Investigators spoke to the male driver and female passenger who both denied ownership or knowledge of who owned the backpack.   The driver was also identified as having a revoked driver's license and not being the registered owner of the vehicle.

36.     Based on the above, investigators towed the Chevrolet from the side of the highway so that they could safely search the vehicle.

37.     Investigators searched the Chevrolet and located a gray Under Armour brand backpack in the rear passenger seat area where MORRIS had been located.   Investigators who conducted surveillance at the Fairfield Inn confirmed that the backpack appeared to be the same

backpack MORRIS had been observed carrying to and from the CRV.  Inside the backpack, investigators located 10 packages wrapped in green plastic wrap and 1 package wrapped in clear plastic wrap.  Within these packages were a total of approximately 169 cylinders of pressed pink powder weighing approximately 1.7 kilograms.  Also located in the vehicle were unused Ziplock baggies with printed logos on them, which investigators believe were consistent with baggies used to package smaller quantities of narcotics for further distribution.  Based on these seizures, as well as the large quantity of fentanyl which, in my training and experience, is inconsistent with personal use, I believe MORRIS intended to further distribute the fentanyl.

38.    The pressed pink powder cylinders were field tested, which indicated a positive result for fentanyl.

39.    Based on my training and experience, the pink color of the powder was unusual, however, I know that drug traffickers sometimes attempt to "brand" their drugs or make them appear unique and therefore recognizable to customers by altering the appearance in ways that do not impact the drug itself.  For example, I have seen drug traffickers use a logo pressed into kilogram bricks.  I believe the pink color of this suspected fentanyl may be a similar means of branding.

40.    The pink powder has been sent to the DEA laboratory for analysis and the results are pending.  However, as discussed below, the lab has confirmed that additional pink powder distributed by COCONSPIRATOR 1 on later occasions contained fentanyl.  Based on these findings and the field test results here, I believe the pink powder cylinders contain fentanyl.

41.    Based on the above, I believe COCONSPIRATOR 1 drove the CRV to meet MORRIS in the parking lot of the Fairfield Inn, where he delivered to MORRIS the approximately

1.7 kilograms of pink fentanyl located in the backpack, which MORRIS intended to further distribute.

42.     Investigators reviewed GPS data for the CRV which indicated that, after leaving the Fairfield Inn, the CRV drove directly back to 30 Danbury Drive.   Investigators reviewed pole camera surveillance from outside 30 Danbury Drive and observed COCONSPIRATOR 1 exit the CRV at around 8:59 p.m.   COCONSPIRATOR 1 appeared to meet with a male in a white Subaru before COCONSPIRATOR 1 walked into 30 Danbury Drive.   COCONSPIRATOR 1 later walked back out of the 30 Danbury Drive, entered the CRV and drove to his residence, briefly, before driving the CRV to MEDINA's residence at 106 Hawthorne Way.

43.     Based on the above, I believe COCONSPIRATOR 1 drove to meet MEDINA after MEDINA had delivered the 100 grams of suspected fentanyl to CS (on behalf of COCONSPIRATOR 1), and after COCONSPIRATOR 1 had delivered the approximately 1.7 kilograms of fentanyl to MORRIS, because COCONSPIRATOR 1 and MEDINA work closely together to distribute fentanyl.

### *August 4, 2021: COCONSPIRATOR 1 Delivered 384 Grams of Pink Fentanyl in the CRV*

44.     On August 4, 2021, investigators monitored GPS data for the CRV and, at approximately 11:06 a.m., observed that the vehicle left the area of MEDINA's residence at 106 Hawthorne Way and drove to 30 Danbury Drive in Methuen, where it remained for less than an hour.   The CRV then drove to a Market Basket in Seabrook, New Hampshire.

45.     Investigators established physical surveillance at the Market Basket parking lot and inside the grocery store.   At approximately 12:37 p.m., investigators observed a white male standing outside, in front of the Market Basket.   The white male was carrying a messenger-style

bag as well as a black and orange case.   Shortly thereafter, the CRV drove in front of the Market Basket, and when it drove away, the white male was no longer standing in front of the grocery store.   As such, I believe the white male was picked up by the CRV.   The CRV drove to an adjacent parking lot, where it parked.   After approximately one minute, investigators observed the white male walking away from the CRV carrying the black and orange case, but no longer carrying the messenger-style bag.   The white male then walked to a Ford Fusion vehicle.   Based on the above, I believe the driver of the CRV (whom investigators could not see at the time, but was later identified as COCONSPIRATOR 1) picked up the white male in front of the Market Basket and that the white male delivered the messenger-style bag to COCONSPIRATOR 1.

46.     Investigators followed the Ford Fusion as it drove away from the Market Basket and into Maine.   At approximately 1:47 p.m., Maine State Police executed a traffic stop of the Ford Fusion, at which point another male was identified as the driver and the previously-observed white male[4] was the passenger.   Inside the Ford Fusion, investigators located the black and orange case the white male had carried to the meeting with COCONSPIRATOR 1, inside of which investigators located approximately 38 "fingers" or 10-gram portions of pressed pink powder, for a total of approximately 380 grams.   A field test of the powder indicated positive results for fentanyl.   The powder was also sent to the DEA laboratory, which confirmed that the pink powder contained fentanyl and weighed a total of approximately 384 grams.

47.     Investigators interviewed the white male at Maine State Barracks.   Post-*Miranda*, the white male told investigators that he had been purchasing fentanyl from a source of supply in Lawrence, Massachusetts, whom he knew as "Freddy," for over a year.   The male stated that he

---

[4] Investigators identified the white male but, to protect his identity, I am withholding his name herein.

typically purchased 250-300 grams of fentanyl every 4 days for a price of $250 per "finger" (10-gram quantity).   The white male explained that "Freddy" usually drives a purple/blue Honda CRV and directs him to meet in the bathrooms of stores such as Market Basket in Seabrook, New Hampshire.

48.   The white male told investigators that, earlier that day, he had traveled from Portland, Maine to meet with "Freddy" in the CRV at the Market Basket in Seabrook, where he purchased the 384 grams of fentanyl found in the black and orange case.   The male told investigators he had paid $7,000 for the fentanyl, and that "Freddy" had provided 8-9 "fingers" free of charge.   The white male also told investigators that he had traveled to the same Market Basket the previous week, where he met with "Freddy" to purchase 240 grams of fentanyl. Investigators had conducted surveillance of that prior meeting, on July 27, 2021, and had observed the white male meet with COCONSPIRATOR 1.

49.   During the interview, the white male provided investigators with his telephone number.   Investigators reviewed call records for this telephone number, which confirmed that there were approximately 27 contacts between the male's number and COCONSPIRATOR 1's 4087 Number on August 4, 2021, between 10:34 a.m. and 3:56 p.m. (including approximately 21 texts and 6 voice calls).   These records also confirmed that, on July 27, 2021, there were approximately 26 contacts between the male's phone number and the 4087 Number between 11:41 a.m. and 4:50 p.m.

50.   Based on the investigation to date, and the surveillance observations and toll records that corroborated his statements, investigators believe the white male provided truthful information in this consensual interview.   Investigators further believe that the white male

purchased approximately 384 grams of fentanyl from COCONSPIRATOR 1 (whom he knew as "Freddy") on August 4, 2021, inside the CRV, and also purchased approximately 240 grams of fentanyl from COCONSPIRATOR 1 on July 27, 2021.   I further believe COCONSPIRATOR 1 used the same number to coordinate these deals with the white male as he used to communicate with CS: the 4087 Number.

51.     Meanwhile, GPS data indicated that the CRV drove from the Market Basket directly back to 30 Danbury Drive.   Once there, investigators observed COCONSPIRATOR 1 exit the CRV carrying the messenger-style bag that the white male had delivered.   I believe this messenger-style bag contained the payment from the white male to COCONSPIRATOR 1 for the approximately 384 grams of fentanyl.   According to GPS data, the CRV remained parked outside 30 Danbury Drive until approximately 2:54 p.m., at which point it traveled to one other location before driving to MEDINA's residence at 106 Hawthorne Way in Lawrence, Massachusetts. After approximately one half hour, the CRV drove from MEDINA's residence to COCONSPIRATOR 1's residence.

52.     Based on these travels, I believe that COCONSPIRATOR 1 met with MEDINA following the fentanyl transaction, and that COCONSPIRATOR 1 and MEDINA work closely together to sell fentanyl.

### *August 26, 2021: COLON SANCHEZ Delivered ~150 Grams of Pink Suspected Fentanyl*

53.     On August 26, 2021, at approximately 4:00 p.m., investigators established physical surveillance on the CRV after locating the vehicle parked outside of 75 Abbott Street, Lawrence, Massachusetts.   This address is listed as COLON SANCHEZ's address on his Massachusetts driver's license, and investigators believe it is COLON SANCHEZ's primary residence.

54.     At approximately 4:11 p.m., investigators observed COLON SANCHEZ as the driver as he drove the CRV away from his residence.   Investigators followed the CRV as it drove to the Market Basket parking lot at 25 Storey Avenue, in Newburyport, Massachusetts. Investigators recognized this Market Basket as a location where COCONSPIRATOR 1 had directed CS to meet MEDINA to conduct the above-described fentanyl transaction on July 7, 2021. Ultimately, on that date, COCONSPIRATOR 1 told CS to move to the adjacent parking lot for the Shaw's supermarket at 45 Storey Avenue, where MEDINA delivered 100 grams of fentanyl to CS.

55.     When the CRV arrived in the Market Basket parking lot, it initially parked in a parking spot before pulling to the front of the grocery store at approximately 4:47 p.m. Investigators observed a white female (later identified as MOULTON) get into the passenger seat of the CRV.  The CRV then drove around to the adjacent parking lot for Shaw's at 45 Storey Avenue, and then drove back to the Market Basket parking lot, where MOULTON exited the CRV. MOULTON entered a Toyota Rav4, where investigators observed a male (later identified as RODRIGUEZ) in the front passenger seat.

56.     MOULTON drove the Rav4 onto Interstate 95 North, into New Hampshire.   At approximately 5:00 p.m., New Hampshire state police conducted a traffic stop of the Rav4.   As the Rav4 pulled over, investigators observed RODRIGUEZ looking back in the direction of the troopers and reaching down to his right side. When the vehicle stopped, RODRIGUEZ fled the Rav4 on foot and ran into nearby woods, carrying a backpack.   Shortly thereafter, investigators located RODRIGUEZ in the woods and found the backpack nearby.   Inside the backpack, investigators located 15 cylinder-shaped "fingers" of pressed pink powder wrapped in wax paper, for a total of approximately 150 grams of powder.   A field test of the powder indicated positive

results for fentanyl.   The powder has been sent to the DEA laboratory for analysis, and the results are pending, however, based on the field test results and the color and consistency of the powder (which are similar to the lab-confirmed pink fentanyl powder seized on August 4, 2021, detailed above, and the September 2, 2021 seizure described below), I believe the powder contains fentanyl.

57.     MOULTON and RODRIGUEZ were released without charges at the time.

58.     Meanwhile, GPS data for the CRV indicated that COLON SANCHEZ drove from the Market Basket in Newburyport back to his residence at 75 Abbott Street in Lawrence, Massachusetts.

59.     Based on the above, I believe COLON SANCHEZ drove the same CRV COCONSPIRATOR 1 and MEDINA had previously been observed driving, to deliver the approximately 150 grams of suspected fentanyl to MOULTON in the Market Basket parking lot. I believe MOULTON carried the drugs into the Rav4.   I further believe RODRIGUEZ attempted to flee the Rav4 on foot with the backpack containing the drugs because he knew they were in possession of narcotics and wanted to avoid detection and apprehension by law enforcement.

60.     Investigators reviewed call records for the 4087 Number on August 26, 2021 and identified approximately 30 communications (approximately 29 text messages and 1 voice call) between approximately 3:31 p.m. and 5:37 p.m. with telephone number 207-607-9837, which is subscribed to MOULTON.   Investigators also obtained a search warrant for the content of the text messages over the 4087 Number and observed that, at around 4:20 p.m. on August 26, 2021, MOULTON sent a message to the 4087 Number, asking if the deal would take place at, "Market basket."   COCONSPIRATOR 1 confirmed the location for the meeting.   MOULTON informed COCONSPIRATOR 1 when she arrived at the Market Basket and, at approximately 4:34 p.m.,

COCONSPIRATOR 1 directed her to "buy something and stand outside."   At approximately 4:46 p.m., MOULTON texted that she was "out front."   As discussed above, at approximately 4:47 p.m., investigators observed COLON SANCHEZ picking up MOULTON in front of the Market Basket grocery store.

61.    Based on the above, I believe COCONSPIRATOR 1 coordinated the transaction with MOULTON via the 4087 Number and that COLON SANCHEZ then delivered the drugs to MOULTON outside the Market Basket on behalf of COCONSPIRATOR 1.

***September 2, 2021: COCONSPIRATOR 1 Delivered 211 Grams of Pink Fentanyl***

62.    On September 2, 2021, at approximately 4:45 p.m., investigators established physical surveillance on the CRV as it traveled north on Route 495 in Andover, Massachusetts. At approximately 5:03 p.m., the CRV stopped at 30 Danbury Drive in Methuen.   While the CRV was leaving the area of 30 Danbury Drive, investigators observed COCONSPIRATOR 1 was the driver.   Investigators followed the CRV as COCONSPIRATOR 1 drove to the same Market Basket parking lot in New Hampshire where he had been observed delivering suspected fentanyl to the white male on July 27 and August 4, 2021 (detailed above).

63.    After the CRV arrived at the Market Basket parking lot, COCONSPIRATOR 1 entered the Market Basket.   Investigators observed COCONSPIRATOR 1 enter the bathroom, followed soon after by a white male wearing a trucker style hat and black t-shirt.   Moments later, investigators observed the same male exit the bathroom and eventually enter a Chevrolet van. The male drove the van away from the Market Basket.   At approximately 6:15 p.m., New Hampshire state police conducted a traffic stop of the van.   Along with the male driver, there was a female passenger in the van.   Inside the van, investigators located a black Nike fanny pack that

contained 21 cylinder-shaped "fingers" of pressed pink powder wrapped in wax paper, for a total

of approximately 210 grams of powder, as well as a number of pills suspected to be Tramadol and

Gabapentin.   A field test of the powder indicated positive results for fentanyl.   The powder was

sent to the DEA laboratory for analysis, which confirmed that the pink powder contained fentanyl

and weighed approximately 211 grams.

64.    Investigators later reviewed call records for a telephone number subscribed to the

female passenger in the van and confirmed that her number had approximately 7 contacts

(approximately 4 voice calls and 3 text messages) with the 4087 Number between 3:41 p.m. and

7:26 p.m. on this date.   As such, I believe COCONSPIRATOR 1 delivered the fentanyl powder

and various pills to the male inside the Market Basket bathroom on September 2, 2021, after

communicating with the female via the 4087 Number.

65.    Based on the above and the investigation to date, I believe COCONSPIRATOR 1

drove the CRV to the Market Basket in New Hampshire, where he delivered the 211 grams of

fentanyl, which were then seized from the male's van.

### *October/November 2021: DTO Switches Vehicles*

66.    On October 27, 2021, court-authorized GPS data for the Navigator indicated the

vehicle was in the area of COCONSPIRATOR 1's residence.   When investigators arrived, they

observed the Navigator parked in the lot but noticed that the front license plate was no longer

attached to the vehicle.   At around this time, investigators also observed the Explorer drive into

the parking lot driven by a male, though investigators were unable to see the driver well enough

to identify him at the time.   As the Explorer drove by, investigators observed the rear license plate

to be 1VCY69.   Investigators recognized this as the same registration previously attached to the

Navigator.

67.     Investigators followed the Explorer as it traveled to another apartment building, where investigators observed the male operator of the Explorer exit the vehicle and walk to the apartment building.   At this point, investigators observed the driver to be MEDINA.

68.     Investigators reviewed Massachusetts motor vehicle registration information which indicated that the license plate 1VCY69 was previously registered to the Navigator, and was then registered to the Explorer as of October 25, 2021.

69.     After October 25, 2021, GPS data for the Navigator indicated that the vehicle did not move from the parking lot for several days.   Based on the above, I believe the Explorer was the replacement vehicle for the Navigator and that the Target Subjects also used the Explorer, including in furtherance of their drug trafficking activities.

70.     On November 8, 2021, investigators queried the Massachusetts motor vehicle registration for license plate 1VCY59, which was previously registered to the CRV.   As of November 8, 2021, this license plate was registered to the Edge.   Based on the above, I believe the Edge was the replacement vehicle for the CRV, and that the Target Subjects also use the Edge, including in furtherance of their drug trafficking activities.

### November 5, 2021: MEDINA Delivered ~10 Grams of Fentanyl to UC After COCONSPIRATOR 1 Coordinated the Transaction

71.     In November 2021, an undercover agent (UC) took over the phone number previously utilized by the CS to communicate with COCONSPIRATOR 1.

72.     On November 4, 2021, UC received several text messages from 603-242-4045 (the "4045 Number").   COCONSPIRATOR 1 stated: "This is my new ### holla at me."   UC understood this to be COCONSPIRATOR 1 providing the 4045 Number as his new contact

number for UC to obtain fentanyl.   UC attempted to call the 4045 Number and then exchanged a series of text messages with the 4045 Number, including one in which COCONSPIRATOR 1 told UC, "Got some fire shoes come try free."   UC understood this to mean that COCONSPIRATOR 1 was offering UC a free sample of fentanyl.   UC agreed that (s)he would come see COCONSPIRATOR 1 the following day to pick up the free sample.

73.     The following day, November 5, 2021, UC and COCONSPIRATOR 1 continued to exchange text communications via the 4045 Number to arrange their meeting.   UC asked if COCONSPIRATOR 1 had "blues," referring to counterfeit oxycodone pills. COCONSPIRATOR 1 responded that UC could get the blues next time, and arranged the fentanyl sample delivery to take place at the Stop & Shop grocery store located at 100 Macy Street in Amesbury, Massachusetts (the same location as the June 8, 2021 transaction detailed above).

74.     At approximately 2:55 p.m., COCONSPIRATOR 1 sent UC a message from the 4045 Number directing him/her to stand out in front of the grocery store.   UC walked to the front of the grocery store, and, nearly immediately, the Explorer pulled in front of the grocery store. UC entered the Explorer and recognized the driver to be MEDINA.   Upon entering the Explorer, MEDINA told UC that he was going to pull around the corner and hand UC the "stuff" and then let UC out.   MEDINA also made statements to UC about "being careful" of "fucking pigs," which UC understood to be a reference by MEDINA to avoiding law enforcement detection.   Shortly thereafter, MEDINA handed UC a plastic bag with a single cylinder of pressed tan powder, wrapped in wax paper.   The cylinder weighed slightly over 10 grams.   As UC was exiting the vehicle, UC asked MEDINA about getting the "blues" next time.   MEDINA responded, "You got to talk to him, I don't know about that shit."   UC understood this to mean UC would need to speak

to COCONSPIRATOR 1 about the pills.

75.     A field test of the tan powder indicated a positive result for fentanyl.   The powder was sent to the DEA laboratory for analysis, and the results are pending.   Based on the appearance of the powder and the investigation to date, I believe the powder contains fentanyl.

76.     Based on the above, I believe COCONSPIRATOR 1 used the 4045 Number to coordinate a delivery of a 10-gram sample of suspected fentanyl to UC, which was delivered by MEDINA inside the Explorer.

### November 16, 2021: MEDINA Delivered ~60 Grams of Suspected Fentanyl to UC After COCONSPIRATOR 1 Coordinated the Transaction

77.     On November 15, 2021, UC exchanged text messages and calls with the 4045 Number, again believed to be used by COCONSPIRATOR 1.   UC told COCONSPIRATOR 1 that UC wanted to purchase 50 grams of fentanyl powder and 50 purported oxycodone pills. COCONSPIRATOR 1 told UC to call back the following day to coordinate the transaction.

78.     On November 16, 2021, UC communicated with COCONSPIRATOR 1 via the 4045 Number, who directed UC to "100 Macys st" [sic], which UC understood to mean that UC should again travel to the Stop & Shop in Amesbury, located at 100 Macy Street.   At approximately 8:51 p.m., UC traveled to the Stop & Shop and sent a text to the 4045 Number announcing his/her arrival.   Approximately two minutes later, COCONSPIRATOR 1 responded and told UC to go inside the store.   UC traveled inside the Stop & Shop and walked toward the bathroom, at which point UC saw MEDINA walking toward him/her.   MEDINA then turned and walked away from UC.   UC attempted to follow MEDINA, but lost track of him.   UC returned to UC's vehicle to contact COCONSPIRATOR 1.   At approximately 8:59 p.m., COCONSPIRATOR 1 directed UC to 45 Storey Avenue, Newburyport, Massachusetts instead.

As discussed above, 45 Storey Avenue is the address for the Shaw's supermarket where COCONSPIRATOR 1 directed CS to meet MEDINA for the July 7, 2021 controlled purchase of fentanyl, and also the same address where COLON SANCHEZ was observed on August 26, 2021, delivering the fentanyl to MOULTON.

79.     When UC arrived at 45 Storey Avenue, UC waited in front of the Shaw's market. Shortly thereafter, the Explorer pulled in front of the store and UC entered the front passenger seat. MEDINA was the driver, and UC asked MEDINA what happened in the first grocery store. MEDINA told UC that he had seen two cops in the store and did not want to complete the deal in the bathroom at that location.   MEDINA drove the Explorer a short distance and then asked to count the money.   UC provided MEDINA with $1,000 in official funds.   MEDINA counted the money and then handed UC a tied off bag with 6 pressed powder cylinders each consistent with 10-gram "fingers" of fentanyl.   UC asked MEDINA about the pills UC wanted to purchase. MEDINA told UC to contact "him" to discuss, which UC understood to be a reference to COCONSPIRATOR 1.   UC exited the Explorer and returned to the UC vehicle.

80.     A field test of the tan powder wrapped inside the wax paper cylinders, delivered by MEDINA, indicated a positive result for fentanyl.   The powder was sent to the DEA laboratory for analysis, and the results are pending. Based on the appearance of the powder and the investigation to date, I believe the powder contains fentanyl.

81.     Based on the above, I believe COCONSPIRATOR 1 used the 4045 Number to coordinate a delivery of 60 grams of suspected fentanyl to UC, which was delivered by MEDINA inside the Explorer.

*December 20, 2021: MEDINA Delivered ~30 Grams of Suspected Fentanyl and Pills to UC*
*After COCONSPIRATOR 1 Coordinated the Transaction*

82.     On December 10, 2021, UC sent several messages to the 4045 Number seeking to purchase 30 grams of fentanyl and 50 purported oxycodone pills.   After several failed attempts to schedule a meeting, the transaction was ultimately arranged for December 20, 2021, at the same location as the November transaction: Shaw's supermarket at 45 Storey Avenue.   When UC arrived at the Shaw's, UC received a text message from the 4045 Number directing UC to go into the bathroom in the grocery store.   Inside the bathroom, UC met with MEDINA, who handed UC a plastic bag containing 3 cylinders of compressed tan powder wrapped in white paper, weighing approximately 30 grams, as well as 50 blue circular pills.   UC provided MEDINA with $1,000 in official funds, and the men left the bathroom.   MEDINA exited the grocery store and returned to the Explorer, which he drove into the adjacent parking lot.   There, investigators observed MEDINA meet briefly with a white male.

83.     Field tests of the tan powder and the pills both indicated an inconclusive result. The substances was sent to the DEA laboratory for analysis, and the results are pending.   Based on the appearance of the powder and the pills, and the investigation to date (which includes multiple exhibits containing lab-confirmed fentanyl), I believe the powder and pills delivered by MEDINA contain fentanyl.

84.     I believe COCONSPIRATOR 1 used the 4045 Number to coordinate a delivery of 30 grams of suspected fentanyl and fentanyl pills to UC, which were delivered by MEDINA via the Explorer. Based on the investigation to date, I also believe MEDINA provided narcotics to the white male in the adjacent parking lot after meeting UC.

***December 29, 2021:   MEDINA Delivered ~50 Grams of Suspected Fentanyl to UC After
COCONSPIRATOR 1 Coordinated the Transaction***

85.      On December 29, 2021, UC again communicated with the 4045 Number and asked
to purchase 50 grams of fentanyl.   COCONSPIRATOR 1 directed UC to meet at the Shaw's
grocery store located at 4 Plaistow Road, in Plaistow, New Hampshire.

86.      At approximately 3:46 p.m., UC arrived at the prearranged location and notified
COCONSPIRATOR 1 of UC's arrival.   By this time, investigators conducting surveillance in the
parking lot had observed the Explorer already parked in the area.   COCONSPIRATOR 1 directed
UC to go into the store.   As UC walked toward the entrance of the store, UC passed by the
Explorer, and MEDINA whistled to get UC's attention.   UC walked over to enter the front
passenger seat of the Explorer.   Once inside, UC handed MEDINA $1,000 in official funds, and
MEDINA provided UC with a plastic bag containing 5 pressed powder cylinders, weighing
approximately 50 grams.   UC exited the Explorer and returned to the UC vehicle.

87.      A field test of the tan powder wrapped inside the wax paper cylinders, delivered by
MEDINA, indicated a positive result for fentanyl compound or methamphetamine.   The powder
was sent to the DEA laboratory for analysis, and the results are pending.   Again, based on the
investigation to date and the appearance of the substance, I believe this powder contains fentanyl.

88.      I believe COCONSPIRATOR 1 used the 4045 Number to coordinate a delivery of
50 grams of suspected fentanyl to UC, which was delivered by MEDINA inside the Explorer.
Based on all of the above, I believe MEDINA continued to work with COCONSPIRATOR 1 to
distribute fentanyl, and that MEDINA used the Explorer in furtherance of their drug dealing
conspiracy.

*Recent Developments*

89.     On February 5, 2022, investigators received notification that the court-authorized GPS device previously placed on the Edge had been removed from the vehicle.   Prior to the removal, investigators had observed the Edge at an auto body shop and believe that the mechanic may have located the GPS device and informed COCONSPIRATOR 1, who then removed the device to avoid law enforcement surveillance and detection.

90.     Two days later, on February 7, 2022, investigators received a notification that the court-authorized GPS tracking device had also been removed from the Explorer.   Based on the timing of these events, investigators believe COCONSPIRATOR 1 informed MEDINA about the GPS located on the Edge and thereafter located and removed the GPS on the Explorer to further avoid law enforcement surveillance and detection.

91.     At approximately 4:26 p.m., investigators observed COCONSPIRATOR 1 enter the Edge and drive south on Route 495.   Shortly thereafter, location data for the GPS device previously affixed to the Explorer indicated that the device was located in the median of Route 495.   Investigators checked the area and located the GPS device sitting on the ground in the median.   Based on the above, investigators believe MEDINA gave the GPS device previously affixed to the Explorer to COCONSPIRATOR 1 after it was removed from the Explorer, and that COCONSPIRATOR 1 discarded that GPS device out of Edge and onto the median of Route 495 to avoid law enforcement detection.

92.     Later on February 7, 2021, investigators observed the Edge drive to 75 Abbott Street—COLON SANCHEZ's residence, as detailed above.   At approximately 9:20 p.m., investigators observed a black Honda Odyssey registered to COLON SANCHEZ leave the area of

75 Abbott Street occupied by two men.   Investigators were unable to see either man well enough to identify them.   Investigators next observed the Odyssey arrive at one of COCONSPIRATOR 1's residences in Tewksbury, Massachusetts.[5]

93.   The following day, February 8, 2021, investigators located the Edge still parked behind 75 Abbott Street and located the Explorer parked at COCONSPIRATOR 1's other suspected residence in Andover, Massachusetts.   On February 14, 2021, investigators conducted surveillance at both of these locations and again located each vehicle in the same place, now covered in snow (it had snowed in the area on February 13, 2021).

94.   Investigators believe COCONSPIRATOR 1 and MEDINA abandoned the Edge and the Explorer after the GPS devices were located in an effort to avoid law enforcement detection.   Based on the observations above, investigators believe COCONSPIRATOR 1 drove the Edge to COLON-SANCHEZ's residence, where he abandoned the vehicle.   Investigators believe the two men seen leaving in the Odyssey were likely COLON-SANCHEZ and COCONSPIRATOR 1, and that COLON-SANCHEZ likely dropped COCONSPIRATOR 1 off at one of his residences because COCONSPIRATOR 1 did not want to drive the Edge any longer.

*TextNow*

95.   Investigators subpoenaed records from TextNow and confirmed that both the 4087 and the 4045 Numbers utilized by COCONSPIRATOR 1 are TextNow telephone numbers. TextNow is a voice over Internet Protocol (VoIP) service that allows its users to text and call any number in Canada and the United States.   TextNow provides users with a real phone number that can be used on any smartphone, tablet, or desktop computer with an internet connection.   If used

---

[5] Investigators identified two suspected residences for COCONSPIRATOR 1 based on physical and electronic surveillance throughout the investigation.

on a smartphone, the TextNow telephone number can be used independent of any traditional telephone number associated with the mobile device, allowing a user to effectively utilize multiple telephone numbers from one device.

96.     Investigators subpoenaed records from TextNow, which indicated that the 4087 Number was subscribed to username "guccimoney634" with a listed name of "Freddy Mendez" and email address of "guccimoney634@gmail.com."   As noted above, the white male stopped with 384 grams of fentanyl identified his supplier as "Freddy."   The 4045 Number was subscribed to username "guccirokefeller" with a listed name of "Josue Morales" and an email of "guccirokefeller@gmail.com."   Based on all of the above, including the similarity in the aliases and email addresses used to subscribe the two numbers, investigators believe COCONSPIRATOR 1 is the user of both the 4087 and then the 4045 Numbers and that he subscribes the accounts in fake names to avoid having his true identity tied to these telephone accounts.

/

/

/

/

/

/

/

/

/

/

/

CONCLUSION

97.     Based on the above, there is probable cause to believe that MEDINA,
COCONSPIRATOR 1, COLON SANCHEZ, MOULTON, RODRIGUEZ, and MORRIS
conspired to distribute and possess with intent to distribute 400 grams or more of fentanyl, in
violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A)(vi).

I declare that the foregoing is true and correct.


_____
Douglas Ruth
Task Force Officer
Drug Enforcement Administration


Subscribed and sworn via telephone in accordance with Fed. R. Crim. P. 4.1, on this ___ day of
February 2022.

Feb 22, 2022


_____
HON. JUDITH G. DEIN
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS